UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| KNAUF FIBER GLASS, GmbH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:02-cv-1215-DFH-WTL |
| | ) | |
| CERTAINTEED CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |

ENTRY ON MOTION TO COMPEL AND RELATED MATTERS

In what remains of this patent infringement suit, defendant CertainTeed
Corp. has moved to compel plaintiff Knauf Fiber Glass, GmbH, to produce
documents that appear to be covered by the attorney-client and attorney work
product privileges.  CertainTeed contends that Knauf engaged in fraud on the
Patent and Trademark Office ("PTO") so that the crime-fraud exception to both
privileges should bar their application.  Knauf also seeks additional deposition
testimony regarding the work of Knauf's attorneys and their communications with
their clients.  As explained below, the motion to compel is granted in part, with
respect to attorney-client communications dealing with prior art relating to duct
liner products that already used the key material before Knauf's claimed
invention.  On that subject, CertainTeed has made a prima facie showing of fraud
on the PTO sufficient to pierce the privilege so as to require the court's *in camera*
inspection of some documents and communications.  CertainTeed has not made

such a showing with respect to the other topics it has raised.  The motion to compel is denied in all other respects.  In light of the mixed results, the court denies fees and costs to both sides.[1]

I.    *Background*

This case began on August 5, 2002, when Knauf sued CertainTeed for infringement of United States Patent No. 6,270,865 ("the '865 patent").  The patent is titled "High Air Velocity Duct Board Having Minimal Turbulence."  The patent describes  fiberglass duct board for air ducts with a very smooth fiberglass lining on the air stream surface to reduce turbulence in high-velocity air flows.  The patent specification asserts that the smooth fiberglass lining reduces turbulence and therefore reduces the power required to move a given volume of air through the ducts.  CertainTeed responded to Knauf's claim by asserting counterclaims for declarations that the '865 patent is invalid and unenforceable, and by seeking a declaration that the case is "exceptional" under 35 U.S.C. § 285 so that CertainTeed should be awarded its attorney fees and costs.

---

[1]CertainTeed did not comply with this court's Local Rule 37.1 requiring counsel to confer on discovery disputes before filing a motion.  In light of the subject matter of the dispute – accusations of fraud to pierce the privilege claims – the court has chosen to overlook that oversight because of the high probability that a conference would have been futile.  See *Kobelco Metal Powder of America, Inc. v. The Energy Cooperative, Inc.*, 2001 WL 1397311, *1-2 (S.D. Ind. Oct. 30, 2001).

On May 30, 2003, the court held a hearing on claim construction issues and stated its ruling orally.  The parties then filed and briefed several motions for summary judgment.  In the course of that briefing, the parties stipulated that CertainTeed's manufacture, use, and sale of its ToughGard ES and Ultra*Duct Gold duct board products directly infringed claims 3 and 6 of the '865 patent.  See Docket No. 104 (Partial Summary Judgment, July 28, 2003).  This stipulation of infringement fit into CertainTeed's defense theory of anticipation and obviousness.  Certainteed believed it could show beyond dispute that it was selling the infringing products before Knauf had invented or applied for a patent on the supposedly novel invention in the '865 patent.  Where a product infringes a patent but was available for sale before the patented invention, the product necessarily anticipates the claimed invention and renders the claim invalid.  *E.g.*, *Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001).

After briefing on the summary judgment motions had been completed, Knauf took a dramatic step.  It moved to dismiss its patent infringement claims voluntarily under Rule 41(a)(2) of the Federal Rules of Civil Procedure.  The motion was accompanied by a so-called "Super Sack" declaration.  Knauf declared it would not sue CertainTeed under the '865 patent for any product currently or previously made, used, sold, offered for sale, and/or imported into the United States by CertainTeed.  See *Super Sack Mfg. Corp. v. Chase Packaging Corp.*, 57 F.3d 1054 (Fed. Cir. 1995) (declaration rendered case moot, at least in absence of counterclaim seeking coercive relief as distinct from declaratory relief).

The court found that the voluntary dismissal did not moot CertainTeed's counterclaim to have the '865 patent declared unenforceable for inequitable conduct and to have the court award CertainTeed attorney fees and costs. See *Knauf Fiber Glass, GmbH v. CertainTeed Corp.*, 2004 WL 771257, *2-3 (S.D. Ind. March 24, 2004). As part of that same decision, the court also denied on the merits CertainTeed's motion for summary judgment on the inequitable conduct issue and denied as moot Knauf's motion for summary judgment on the issue. As a practical matter, all that remains of the original case is CertainTeed's attempt to have Knauf pay its attorney fees and costs in the litigation.

The court's entry stated that the court would rule in the near future on the motion to compel. That has not happened. As the court studied the motion to compel in more detail, it became clear that in deciding the applicability of the crime-fraud exception to the privileges on the motion to compel, the court would need to consider the merits of all the arguments and evidence submitted on the inequitable conduct issue (covering an eight-year prosecution history). The court has also needed to review those materials while keeping in mind the difference between inequitable conduct and the narrower category of fraud. See *In re Spalding Sports Worldwide, Inc.*, 203 F.3d 800, 807 (Fed. Cir. 2000). Regrettably, the volume of the materials, their complexity, and the court's relatively heavy docket of more pressing matters have delayed the decision on the motion to compel much longer than the court had expected.

II.     *The Crime-Fraud Exception to the Attorney-Client Privilege*

The attorney-client privilege is a foundation for the American legal system. It encourages a client to be frank in sharing information with an attorney even if further disclosure of that information would harm the client.  The privilege does not extend to communications made for the purpose of obtaining advice for the commission of a future or ongoing fraud or crime.  *United States v. Zolin*, 491 U.S. 554, 562-63 (1989); *Clark v. United States*, 289 U.S. 1, 15 (1933); *Spalding Sports*, 203 F.3d at 806-07.  The crime-fraud exception also applies to the attorney work-product doctrine.  *In re Grand Jury Proceedings*, 33 F.3d 342, 348 (4th Cir. 1994); *In re John Doe Corp.*, 675 F.2d 482, 491-92 (2d Cir. 1982).  Knauf has provided a log of privileged documents.  CertainTeed's only challenge to the claim of privilege is that the crime-fraud exception should apply.

The principal legal disputes between the parties in this case concern (a) the relationship between the inequitable conduct defense under patent law and the doctrines of common law fraud and "Walker Process" fraud under *Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp.*, 382 U.S. 172 (1965), and (b) the threshold showing of fraud needed to pierce the privileges.

(a)     The Federal Circuit has distinguished between the broad doctrine of inequitable conduct and the criminal or fraudulent conduct needed to pierce the attorney-client or work-product privilege:

> Consistent with the Supreme Court's analysis in *Walker Process*, . . . we have distinguished "inequitable conduct" from *Walker Process* fraud, noting that inequitable conduct is a broader, more inclusive concept than the common law fraud needed to support a *Walker Process* counterclaim. . . . Inequitable conduct in fact is a lesser offense than common law fraud, and includes types of conduct less serious than "knowing and willful" fraud.
>
> \* \* \* \* \* \*
>
> Because severe penalties are usually meted out to the party found guilty of such conduct, [common law] fraud is generally held *not* to exist unless the following indispensable elements are found to be present:  (1) a representation of a material fact, (2) the falsity of that representation, (3) the intent to deceive or, at least, a state of mind so reckless as to the consequences that it is held to be the equivalent of intent (scienter), (4) a justifiable reliance upon the misrepresentation by the party deceived which induces him to act thereon, and (5) injury to the party deceived as a result of his reliance on the misrepresentation.

*Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059, 1069-70 (Fed. Cir. 1998) (citations and footnotes omitted), quoted in *Spalding Sports*, 203 F.3d at 807.  In *Nobelpharma*, the Federal Circuit went on to hold that a fraudulent omission, as well as a fraudulent statement, could support a finding of fraud if there is also "independent and clear evidence" of deceptive intent and reliance. 141 F.3d at 1070; accord, *Spalding Sports*, 203 F.3d at 807.  One way of showing reliance is to show that the patent would not have issued but for the misrepresentation or omission.  *Spalding Sports*, 203 F.3d at 807, citing *Nobelpharma*, 141 F.3d at 1070-01.

In *Walker Process*, the Supreme Court held that where a patentee had obtained a patent "by knowingly and willfully misrepresenting facts to the Patent Office," an effort to enforce the patent could violate Section 2 of the Sherman

Antitrust Act, 15 U.S.C. § 2, which outlaws attempts to monopolize commerce. 382 U.S. at 177-78.

The defense of inequitable conduct covers a broader range of conduct than fraud on the PTO, and the court must use its discretion to equitably balance all relevant factors.   Inequitable conduct still requires proof of intent to deceive. *Kingsdown Medical Consultants, Ltd. v. Hollister Inc.*, 863 F.2d 867, 876 (Fed. Cir. 1988) (*en banc* in relevant part) ("a finding that particular conduct amounts to 'gross negligence' does not of itself justify an inference of intent to deceive; the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive").

CertainTeed believes it can show inequitable conduct by Knauf, so that the court should declare the case exceptional under 35 U.S.C. § 285 and should order Knauf to pay CertainTeed its attorney fees and costs incurred in defending the patent infringement claims.   The issue on the motion to compel, however, is whether CertainTeed has made a sufficient showing of either common law fraud or Walker Process fraud so as to pierce the attorney-client and attorney work product privileges.

(b)     "To invoke the crime-fraud exception, a party challenging the attorney-client privilege must make a prima facie showing that the communication

was made 'in furtherance of' a crime or fraud." *Spalding Sports*, 203 F.3d at 807. What is a prima facie case of fraud?   The party seeking to overcome the attorney-client privilege need not conclusively prove fraud and does not need to submit direct evidence of fraudulent intent to make a prima facie showing of fraud.   *Id.* at 808, citing *Nobelpharma*, 141 F.3d at 1071.   More than mere allegations are required, however, and the court is entitled to weigh the probative value of evidence.   See *In re Grand Jury Proceedings*, 33 F.3d at 352; *In re Feldberg*, 862 F.2d 622, 625-26 (7th Cir. 1988).   If the party claiming the privilege provides a satisfactory explanation for the evidence suggesting fraud, the protection of the privilege may stand intact.   *Feldberg*, 862 F.2d at 626; *Motorola, Inc. v. Vosi Technologies, Inc.*, 2002 WL 1917256, *4 (N.D. Ill. Aug. 19, 2002) (finding crime-fraud exception did not apply in patent case where most reasonable inference of evidence was honest belief that statement was true).

III.   *Claims of Fraudulent Statements and Omissions*

    A.   *Failure to Inform PTO of Knauf's "Duct Liner M"*

The Knauf invention (or at least the commercial embodiment of it) used the same commercially available glass mats that Knauf had previously been using to make a duct liner called "Duct Liner M" used to line ducts made of sheet metal. Beyer Dep. at 124.   CertainTeed contends that Knauf's use of the same glass mats on its Duct Liner M was highly relevant prior art that should have been disclosed to the PTO.   Specifically, CertainTeed contends that the prosecution history shows

that the applicants distinguished other prior art on grounds that were inconsistent with Knauf's own Duct Liner M, which had been on sale no later than 1988. Docket No. 77, Ex. 44 (Knauf 1988 catalog). The applicants did not disclose Duct Liner M to the patent examiner as relevant prior art.

On August 18, 1994, the examiner had rejected an early version of the patent application based on Jain's U.S. Patent No. 4,839,222. The examiner wrote:

> Jain explicitly teaches the use of a coating to smooth the surface of the fiberglass in order to lower air flow resistance (column 1, lines 30-40). In view of this teaching of the need for a smooth surface on the inside of a fiberglass duct any surface treatment, be it a coating or a face sheet fabric without a coating, that provided a smooth surface as compared to the fiberglass would have been obvious to one of ordinary skill in the art at the time of the instant invention absent a showing of unexpected results.

Docket No. 77, Ex. 5 at 4. The applicants responded on October 19, 1994. They argued that Jain did not teach anything other than use of a water-based coating to smooth the air stream surface of the fiberglass fabric:

> Jain does not teach the use of fabric disposed on the interior surface of a duct board for engaging air flow. The only fabric taught by Jain is subsequently covered with an aqueous coating. *Therefore, there is no support for the contention that the use of a face sheet fabric without a coating would have [been] obvious to one of ordinary skill in the art. Jain does not make the suggestion and it is respectfully submitted that none of the other prior art references of record do either.*

Ex. 6 at 6 (emphasis added).  This argument did not convince the examiner.  After an interview, he stuck to his position that "the teaching of making a smooth surface by coating and fabric renders obvious fabric alone." Ex. 7 (Nov. 22, 1994).

In opposing the motion to compel, Knauf argues that CertainTeed has failed to show that Duct Liner M was material to the patent application.  Information can be material where the applicant has withheld it and has made an argument for patentability that could not have been made if the information had been disclosed.  *Bruno Independent Living Aids, Inc. v. Acorn Mobility Services, Ltd.*, 394 F.3d 1348, 1353-54 (Fed. Cir. 2005) (affirming finding of materiality where undisclosed reference would have undermined claim that particular feature was novel); *GFI, Inc. v. Franklin Corp.*, 265 F.3d 1268, 1275 (Fed. Cir. 2001) (same).

The materiality seems clear to the court.  The issue before the examiner was whether Knauf's claimed invention in which precisely the uncoated lining was bonded to the fiberglass duct board was actually novel and not obvious.  The applicants distinguished Jain on the ground that it did not teach use of an uncoated lining, nor did other prior art references.  The court assumes it is literally true that "the other prior art references *of record*" also did not suggest use of an uncoated lining for a duct board.  But the fact that Knauf itself had already been making and selling an uncoated duct liner for several years, with precisely the same lining fabric for use with rigid metal ducts, would seem to be material to an examiner who is being told that the prior art did not suggest use of an

uncoated lining.  That information about the uncoated duct liner seems material and non-cumulative in light of the silence of "the other prior art references of record" on this point.  The court does not see how the applicants could have made their argument to distinguish Jain if they had disclosed to the patent examiner the fact that their invention took a commercially available product for lining sheet metal ducts and glued it to the inside of fiberglass duct board.[2]

Inventor Beyer submitted an affidavit explaining the differences between rigid duct board and flexible duct liner products and asserting that he never considered whether he had an obligation to disclose this product to the PTO. Docket No. 86, Ex. 2, ¶¶ 11-13.  The other living inventor has also testified that he was aware of the existing mat-faced duct liners when he came up with the idea for a mat-lined duct board.  Noonan Dep. at 88 (testifying he was then aware that mat-faced duct liners had passed erosion tests).

The Beyer affidavit does not explain why the differences between the products are so great that, on the issue of choosing a very smooth lining for a high

_____

[2]In opposing the summary judgment motion, Knauf argued that inequitable conduct cannot be based on inaccurate descriptions of references before the examiner.  Docket No. 112 at 14, citing *Life Technologies, Inc. v. Clontech Labs., Inc.*, 224 F.3d 1320, 1326 (Fed. Cir. 2000).  The problem here is not the description of references that were actually before the examiner.  The problem is the failure to disclose Knauf's own existing duct liner product with the same uncoated fabric mat that the applicants used in their claimed invention.  For essentially the same reason, Knauf's argument that information about its own duct liner product would have been cumulative is not persuasive.  The prior art in the record did not suggest use of an uncoated liner, but Knauf's uncoated duct liner product on the market clearly did suggest such use.

velocity duct, a person skilled in the art would not consider other very smooth linings available on commercial flexible products. See *Critikon, Inc. v. Becton Dickinson Vascular Access, Inc.*, 120 F.3d 1253, 1257 (Fed. Cir. 1997) (district court clearly erred in failing to find inequitable conduct where witnesses failed to offer plausible explanation for failure to disclose material prior art). Also, the examiner was already drawing on other prior art involving flexible ducts, including the Hoffman and Schroeder patents. See, *e.g.*, Docket No. 73, Ex. G at 4-5 (examiner's rejection); Docket No. 77, Ex. 4 at 4-5 (applicants' response to reliance on flexible products).

Even if the applicants had arguments as to why the flexible duct liner should not be treated as relevant, they and their lawyers knew that *the examiner* was looking at flexible duct products in evaluating their claimed inventions. See, *e.g.*, Docket No. 77, Ex. 4 at 4-5. Under those circumstances, they were not entitled to make a unilateral decision to withhold prior art from the examiner. "It is axiomatic that '[c]lose cases should be resolved by disclosure, not unilaterally by applicant.'" *Critikon*, 120 F.3d at 1257, quoting *LaBounty Mfg., Inc. v. United States Int'l Trade Comm'n*, 958 F.2d 1066, 1076 (Fed. Cir. 1992). At the time of this application, PTO regulations required disclosure of non-cumulative information that either (1) established by itself or in combination with other information a prima facie case of unpatentability; or (2) refuted or was inconsistent with a position the applicant was taking in either opposing a PTO

argument of unpatentability or asserting an argument of patentability.  37 C.F.R. § 1.56.  The second description appears to fit this case.

Intent is ultimately a question of fact.  See *Dayco Products, Inc. v. Total Containment, Inc.*, 329 F.3d 1358, 1364-68 (Fed. Cir. 2003) (reversing summary judgment based on inequitable conduct where materiality of rejection of similar claims in another application was shown but there was a genuine issue of fact as to intent to deceive).  Whether the court should infer fraudulent intent from the omission is a matter of degree.  See *Critikon*, 120 F.3d at 1256-57 (reversing district court's finding of no inequitable conduct; weight of evidence showed clearly an intent to defraud in failure to disclose prior art).  The omission in this case concerned not prior art in general but the closely related products of the applicants' own company, using the same material to solve the same problem that the invention claimed to have solved.  The inventors clearly knew of the product. The materiality of the omission seems great, especially in view of the issues the examiner raised in using Jain to reject the applicants' claims in the early stages of the prosecution, as well as the applicants' response.

Without determining the ultimate question of intent to defraud, the court finds that CertainTeed has made a sufficient prima facie showing of fraud so as to pierce the attorney-client and work product privileges, at least to the extent of *in camera* review, with respect to the subject matter of Knauf's Duct Liner M product and whether it would or should be disclosed to the PTO.  The Beyer

-13-

affidavit does not convince the court that the prima facie showing has been undermined by the differences between rigid duct board and flexible duct liner.

B.     *Failure to Inform PTO of Schuller's "Linacoustic R Duct Liner"*

In the early 1990s, Schuller International, Inc. distributed fiber glass duct liners for use with metal air ducts.  A product called "Linacoustic R" was a fiber glass liner with a fiber glass mat facing on the air stream surface.  Docket No. 77, Ex. 42 (Schuller 1993 catalog).  The Linacoustic R product was marketed as a solution to the same problem addressed by the '865 patent, allowing high air velocity.  Ex. 42 at 13.  CertainTeed argues that the Schuller product was also prior art fraudulently withheld from the PTO because, like the Knauf duct liner, it would have shown that the combination of the uncoated mat lining with a rigid duct was not novel.

To show the inventors' knowledge of the Schuller product, CertainTeed relies on a memorandum dated March 10, 1994 from Knauf's Mike Gravino to field sales representatives, regional sales managers, and others with information about Schuller and CertainTeed products. Ex. 43.  The attachment included information about the Schuller "Linacoustic R" duct liner, which also featured a fiber glass mat facing on the air stream surface.  Ex. 43 at KF003204.

The duty of candor applies to information actually known to applicants and their attorneys, but not to information known only to others employed by the

-14-

same corporation.  See  37 C.F.R. § 1.56(a); *B.F. Goodrich Co. v. Aircraft Braking Systems Corp.*, 72 F.3d 1577, 1584-85 (Fed. Cir. 1996) (affirming finding of no inequitable conduct; though others in company were aware of prior art reference, evidence did not show that inventor or his attorney possessed it).  CertainTeed has not shown that the inventors – Hauk, Noonan, or Beyer – even saw the document, let alone that they read about the Linacoustic R duct liner.  CertainTeed also has not shown that the inventors' attorneys knew of Linacoustic R.

CertainTeed has responded to this point by arguing that the court should find it is likely that at least Hauk and Noonan knew about the Schuller product. (Beyer has testified that he had heard of the Schuller product but would not be able to identify it and had no direct experience with it.  Beyer Aff. ¶ 14, Docket No. 86, Ex. 2.)  CertainTeed asserts that Hauk was the head of research and development for Knauf and that Noonan was in charge of testing competitors' products.  Def. Reply Br. at 11.  However, CertainTeed has deposed the two living inventors.  It did not ask either one about the Schuller product.  Before taking the step of piercing the attorney-client privilege on grounds of fraud, it would be reasonable to expect the opposing party at least to ask the key witnesses the key question on this essential foundation for the fraud allegation.

CertainTeed has not come forward with evidence of actual knowledge by any relevant person.  Such evidence of actual knowledge is needed to meet even the lower threshold of inequitable conduct.  See *Nordberg, Inc. v. Telsmith, Inc.*,

82 F.3d 394, 396-97 (Fed. Cir. 1996) (affirming finding of no inequitable conduct where defendant failed to show that relevant employees knew of the prior art). Thus, even if the court assumes that Schuller's Linacoustic R duct liner was material prior art, the failure to cite it does not support an inference of deliberate fraud on the PTO by the applicants or their attorneys.

C.    *Brower Statements*

CertainTeed also claims that Knauf, as part of an effort to defraud the PTO, submitted false statements by Glenn Brower, Knauf's technical services manager. During the prosecution of what became the '865 patent, Brower submitted three declarations.  In the first statement signed on June 19, 1996, he stated under oath that he had "personal familiarity with the testing described" in the applicant's supplemental amendment "since said tests were conducted under [his] direction and control," and he stated that the results described in the supplemental amendment were true and accurate.  Docket No. 73, Ex. I, ¶ 5.  The supplemental amendment stated that the test was an erosion test in which the number of particles dislodged from the air facing surface under comparable conditions was measured.  *Id.*, at KF000419.  The claimed test results showed an erosion rate that was only about 20 percent of the industry standard product, indicating that the new invention would require lower power to move the same volume of air.  *Id.* at KF000421.

In his deposition on April 3, 2003, Brower testified that he did not do the erosion testing himself but that he witnessed the testing.  Docket No. 73, Ex. J at 22.  He also testified that the testing did not involve counting particles dislodged in the test, *id.* at 24-26, but it is far from clear that his testimony on that point referred to the same erosion testing rather than testing done when he had a previous job with another company.  Brower testified in his deposition at first that he had not seen the erosion testing described in the supplemental amendment but that he had seen the friction loss testing.  *Id.* at 104.  When he was shown his affidavit of June 19, 1996, stating that he had witnessed the erosion tests, he responded:  "I'm absolutely positive I was at the friction loss tests.  I don't remember.  I don't remember personally being at an erosion test, but I could have been.  I really don't remember that."  *Id.*  He also did not recall attending an erosion test where particles were counted or asking to have particles counted.  *Id.* at 105.  He also showed that he was familiar with erosion test methods and that he asked an outside laboratory to conduct such tests with the invention.

The tension between the 1996 affidavit and the 2003 deposition testimony does not support a prima facie showing of deliberate fraud on the PTO.  It is theoretically possible, of course, that the test data reported in the supplemental amendment were complete fabrications.  The vagaries of human memory provide the more likely explanation for this tension.  Also, while the UL erosion tests may be graded on a pass-fail basis, as Brower and Noonan testified in their depositions, that practice does not show that the particle counts reported in the

supplemental amendment were fabrications.  In fact, the evidence before the court indicates that such particle counts are part of the testing and are included in the test reports.  See Docket No. 76, Ex. 20 at 11-12 (UL test results on CertainTeed's own products showing particle counts in erosion testing).[3]

CertainTeed also focuses on Brower's statements about cost issues.  In a separate sworn statement signed on June 19, 1996, he stated in Paragraph 3 that the invention would provide a cost advantage by reducing the friction loss.  Docket No. 73, Ex. K, ¶ 3.  The cost advantages could be realized either by reducing the size of the ducts or by reducing the energy needed to run fans to move the volume of air.  *Id.*, ¶ 3(a) and (d).  With these statements, CertainTeed contrasts Brower's deposition testimony.  He was asked: "[T]he mat adds a substantial amount to the cost of the duct board, does it not?"  He answered: "It's significant.  I don't know if it's substantial.  It's significant."  Docket No. 73, Ex. J at 143.

CertainTeed's claim that there is a direct contradiction here is baseless.  Brower's 1996 statement addressed the general prospect of system savings.  He asserted such savings could be accomplished either by reducing the size of the ducts (and thus the material used to make them) or by reducing the energy used to blow air through the system.  The 1996 statement did not attempt to quantify

---

[3]In its reply brief in support of its motion to compel, CertainTeed added a new argument, contending that the applicants and Brower failed to tell the PTO that one of the duct boards was tested at two and a half times its rated air velocity.  Docket No. 127 at 12.  The court has not considered the new argument raised improperly in reply.

the system savings, nor did it address whether a given quantity of duct board would cost more with a mat lining and, if so, how much more. The one answer in the 2003 deposition indicates that a given quantity of duct board costs more with mat lining than without. That answer also does not quantify the difference. There is no contradiction and no support for an inference of fraud on the PTO in Brower's 1996 statement about system costs.

        D.    *Best Mode*

The specification of a patent "shall set forth the best mode contemplated by the inventor of carrying out his invention." 35 U.S.C. § 112. The requirement is a fundamental aspect of the patent bargain between the public and the inventor. The inventor receives the temporary right to exclude others from practicing the invention. In return, the inventor must make a full disclosure to the public about how to practice the invention after the patent protection expires. See, *e.g.*, *Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 150-51 (1989) (describing bargain, including required disclosure of best mode).

CertainTeed contends that the Knauf applicants engaged in fraud by also concealing the best mode for practicing the invention. Failure to disclose the best mode may invalidate a patent without being intentional. Where the issue is inequitable conduct, however, a party must show *intentional* concealment of the best mode. *In re Hayes Microcomputer Products, Inc. Patent Litigation*, 982 F.2d 1527, 1546 (Fed. Cir. 1992); see also *Hoffmann-LaRoche, Inc. v. Promega Corp.*,

323 F.3d 1354,1367 (Fed. Cir. 2003)  (affirming relevant finding of inequitable conduct based on intentional deception; best mode requirement "does not entitle the inventor to suggest that the best mode has been performed when it has not, and to report results that have not actually been observed"); *Consolidated Aluminum Corp. v. Foseco Int'l Ltd.*, 910 F.2d 804, 808 (Fed. Cir. 1990) (affirming finding of inequitable conduct where inventors intentionally failed to disclose true best mode and included false description of best mode in patent application).

CertainTeed first contends the applicants engaged in such deceit by modifying their application so as to transform what they had once described as the preferred embodiment of their invention into a mere alternative.  The specific issue is how the glass mat lining for the duct board would be attached to the duct board.  The inventors have testified that Knauf's commercial embodiments of the '865 patent used adhesive to attach the lining to the duct board.  Inventor Noonan testified that they also tried increasing the levels of binder on the top layer of the duct board to have the liner bond without adhesive.  Noonan Dep. at 78.  The inventors believed they had better results – better bonding between the liner and the duct board – with adhesive.  Noonan Dep. at 78-79.

The specification of the issued patent teaches the use of an adhesive.  '865 Patent, col. 4, lines 34-38, 54-60 (describing figures).  The passage in lines 34-38 refers to "An alternative embodiment. . . ."  The passage in lines 54-60 indicates that the mat fabric can be adhered to the duct board using only the heat of the

oven and uncured or only partially uncured binder in the duct board itself, but it then cautions: "However, to ensure that no separation of mat facing 11 from the fiberglass board 50 will later occur, the adhesive 51 may be used." The specification also includes this instruction:

> By applying the fabric to the formed blanket of fiber glass prior to curing the resin bonded blanket in a curing oven, the surface facing means may be directly adhered to the fiber glass. Alternatively the surface facing means may be adhered to the blanket by an adhesive.

*Id.*, col. 5, lines 28-32. The issued patent also describes the use of adhesive in "preferred embodiments." *Id.*, col. 2, lines 17-22. The patent never describes an absence of adhesive as "preferred." In fact, the caution in column 4, lines 54-60 is reasonably clear advice to use an adhesive if the maker wants to "ensure that no separation . . . will later occur," which most makers presumably would prefer.

The original application described the use of adhesive as the preferred way to attach the mat to the board. Docket No. 77, Ex. 2 at 8, lines 13-16, and pages 9-10. After several rounds of rejections by the examiner, and with new counsel, the applicants submitted their "continuation-in-part" application. That application amended the specification and deleted the more detailed description of the manufacturing method. See Docket No. 77, Ex. 17.

Inventor Noonan testified that the inventors preferred the adhesive to other methods of bonding the liner to the duct board. Noonan Dep. at 78-79. Inventor Beyer testified that the adhesive was used "to ensure it stuck." Beyer Dep. at 122.

All commercial embodiments for the Knauf patents were made with adhesive. Beyer Dep. at 112-13, 122, 128, 147.  The inventors also managed to attach the lining without adhesive in their experiments, but they believed they had better results with adhesive.

The evidence does not establish a prima facie case of intentional fraud regarding the best mode.  The applicants informed the PTO of their original preference for using adhesive.  That document was going to be part of the public record if the patent issued.  A fair reading of the issued patent shows that it actually encourages the use of adhesive.  It certainly does not expressly claim that the best mode did not use adhesive.  Beyer testified that he honestly disclosed the best mode and that it was not necessary to specify the specific overspray adhesive that was used because one of ordinary skill in the field would have been familiar with the choices.  Docket No. 86, Ex. 2, Beyer Aff. ¶¶ 4-5.  CertainTeed has not rebutted that testimony with evidence from others familiar with ordinary skill in the relevant field.

CertainTeed also contends that Knauf concealed the best mode for practicing the claimed invention by withholding specific information about the mat fabric that was actually used, the commercially available Lydall Manning Maninglas 1296 28-pound mat.  The patent states that the mat facing "is preferably formed with a basis weight of about 30 pounds per 3000 square feet with a tensile strength of about 7 lb./inch minimum in the machine direction and

about 5 lb./inch minimum in the cross direction." '865 Patent, col. 3, lines 26-29. At another point, the patent says that the preferred fabric "is a lightweight, woven or non-woven, fabric having a weight of about 15 to about 35 pounds per 2,880 square foot ream of fabric."  Col. 5, lines 22-25.  Claims 1, 5, and 8 of the patent all included as a limitation that "the mat facing has a weight of about 30 pounds per 3,000 square feet."

The evidence shows that the mat sold as "28 pound" mat actually has a weight that ranges from 25 to 33 pounds per 2,880 square feet.  Docket No. 76, Ex. 30.  That range is obviously very close to "about 30 pounds per 3,000 square feet."  CertainTeed has not shown that the range of weights or the different ways in which they were expressed in the patent would have confused persons of skill in the art.   It is well established that the best mode requirement does not require disclosure of production specifications or other routine details.  See *Eli Lilly and Co. v. Barr Laboratories,Inc.*, 251 F.3d 955, 963 (Fed. Cir. 2001); *Young Dental Manufacturing Co. v. Q3 Special Products, Inc.*, 112 F.3d 1137, 1144-45 (Fed. Cir. 1997).  Co-inventor Beyer has testified that he did not believe it was necessary to identify the specific commercial mat facing or overspray product used because persons of ordinary skill in the field would be familiar with a range of products.  Docket No. 86, Ex. 2 ¶ 5.  The court assumes that CertainTeed has ready access to witnesses with at least ordinary skill in the relevant art.  It has not rebutted that testimony.  CertainTeed has not made a prima facie case of fraud on the PTO by an alleged failure to disclose the best mode of the invention.

E.    *The Consequences of the Prima Facie Fraud Showing*

CertainTeed has made a prima facie showing of intentional fraud on the PTO by withholding information about Knauf's own duct liner product that used the same mat liner used in the claimed invention.  That is not to say, however, that the court has found that Knauf in fact engaged in such fraud.  In addition, CertainTeed has not tied specific communications to the alleged fraud.  It could not reasonably be expected to do so without seeing the documents.  CertainTeed has argued instead that the entire effort to secure the '865 patent was fraudulent, and it would like access to all privileged communications related to the case.

CertainTeed has established a prima facie case for fraud that is much narrower than it argued in its motion papers.  Given that narrow showing, the court does not believe the remedy is simply to require disclosure to CertainTeed of every document on the privilege log and to order witnesses to answer all questions without being able to invoke the attorney-client privilege.  The prima facie showing is sufficient, however, to require *in camera* review of specific documents for possible disclosure if it appears that such documents were part of an effort to defraud the PTO through intentional failure to disclose prior art involving flexible products.  See *In re National Mortgage Equity Corp. Mortgage Pool Certificates Litigation*, 116 F.R.D. 297, 300 (C.D. Cal. 1987) (Tashima, J.) (ordering *in camera* inspection to determine whether privileged documents were reasonably related to fraud or crime); *Union Carbide Corp. v. Dow Chemical Co.*, 619 F. Supp. 1036, 1052 (D. Del. 1985) (in deciding whether specific documents were prepared

-24-

in furtherance of fraud, "courts often call for *in camera* inspection of the documents in question"); see also *Leybold-Heraeus Technologies, Inc. v. Midwest Instrument Co.*, 118 F.R.D. 609, 615-16 (E.D. Wis. 1987) (ordering production of documents after *in camera* inspection showed that some were in furtherance of fraud on PTO).

The court therefore ORDERS Knauf to file under seal with the court for *in camera* inspection any documents on the privilege log that address or relate to Knauf's own duct liner product *or other flexible duct products* that were not disclosed to the PTO, including any documents that address or relate to whether such duct liner products were relevant to the claimed invention and/or should be disclosed to the PTO in connection with the application. (For purposes of the *in camera* review, note that the scope here includes flexible products other than Knauf's, such as the Schuller products, if those products were not disclosed to the PTO.) Knauf shall also submit for *in camera* inspection sworn answers to interrogatories that cover these same subjects but were not answered on grounds of privilege. The documents shall not be redacted, but Knauf shall identify relevant portions of any such documents and may indicate redactions it believes should be made if the court orders disclosure of any such documents. Knauf shall also file a public index, and may file an *in camera* explanation, of the documents submitted for review. Knauf shall submit these materials no later than March 1, 2006. In reviewing the materials, the court will keep in mind Judge Wright's caution in a similar case about the dangers of conducting such a review

without input from the adverse party most interested in seeing the materials.  See

*Hercules, Inc. v. Exxon Corp.*, 434 F. Supp. 136, 155 n.17 (D. Del. 1977).


F.     *What Has Not Been Decided*

In light of the complex relationship between the issues on the motion to compel and the issues on the underlying issue of inequitable conduct as a basis for declaring the case exceptional under 35 U.S.C. § 285, it is worth spelling out what the court is deciding and what it is not deciding.  On the issue of failure to disclose the Knauf Duct Liner M product to the examiner, the court is deciding that CertainTeed has made a sufficient prima facie showing of fraud to pierce the attorney-client and work product privileges, at least to the extent of requiring *in camera* review of relevant documents for possible disclosure to CertainTeed.  The court is not finding that the applicants committed actual fraud on the PTO.  That is an issue for a later stage.


On the issue of failure to disclose the Schuller product, the court is not finding that the applicants did not commit fraud or did not engage in inequitable conduct.  The court is finding only that CertainTeed has not made a prima facie showing of fraud sufficient to pierce the privileges because it has not yet shown that the applicants or their attorneys were aware of the Schuller product.  On the issues of the Brower statements and the best mode disclosure, the court finds that CertainTeed has not made a prima facie showing that the applicants committed fraud on the PTO sufficient to pierce the attorney-client and work product

privileges.  If CertainTeed wishes to pursue any of those allegations as part of its inequitable conduct theory, though, it may do so.

Finally, the court is deciding only those issues squarely presented by the motion to compel.  CertainTeed included in its motion for summary judgment papers several other alleged examples of inequitable conduct.  One example was the supposedly intentional failure to disclose to the PTO the existence of CertainTeed's own ToughGard product.  Although CertainTeed's motion to compel stated that it was incorporating its summary judgment papers, the court believes that the fairest approach is to base its decision on the motion to compel on those examples specifically argued in the motion to compel itself.  In deciding that motion, the court has considered the evidence and arguments submitted on the motion for summary judgment, but the court believes it has been fair to assume that CertainTeed selected its best arguments and examples for use in the motion to compel.  On the merits of the inequitable conduct counterclaim, if CertainTeed wishes to pursue those other examples discussed in the motion for summary judgment, it may do so.

IV.    *Knauf's Motion to Reconsider*

In Docket No. 161, Knauf has moved to reconsider the denial of its summary judgment motion on the issue of inequitable conduct.  The court denied the motion in 2004 on the assumption that it was moot.  Because of the remaining issue under 35 U.S.C. § 285, however, the court now believes that the motion

should not have been denied as moot.   If Knauf were entitled to summary judgment on the claims of inequitable conduct, that would effectively rebut the claims of fraud on the PTO.

CertainTeed has objected to reconsideration on the theory that Knauf waited too late to seek it.   Contrary to CertainTeed's argument, Knauf's motion to reconsider is not governed by either Rule 59 or Rule 60 of the Federal Rules of Civil Procedure.   No judgment has been entered.   Any interlocutory decision remains subject to reconsideration prior to judgment.   Courts do not undertake reconsideration lightly, of course, but this is an instance where it is entirely appropriate.   The court first denied the motion without considering its merits.

Accordingly, the court grants the motion to reconsider and has considered Knauf's motion on the merits.   The court finds that Knauf's motion for summary judgment should be denied on its merits, even recognizing the "clear and convincing" standard of proof and the danger that such accusation can be made too easily and that "relatively routine" acts in patent prosecution can be portrayed as intended to deceive.   See *Northern Telecom, Inc. v. Datapoint Corp.*, 908 F.2d 931, 939 (Fed. Cir. 1990).   A claim of inequitable conduct calls on the court to exercise its equitable judgment in light of all relevant factors.   In extreme cases, such defenses can be decided on summary judgment, but the case law cautions against doing so.   The question of intent is ordinarily a fact question that is not often susceptible to summary judgment.   *E.g.*, *PerSeptive Biosystems, Inc. v.*

*Pharmacia Biotech, Inc.*, 225 F.3d 1315, 1320-21 (Fed. Cir. 2000) (affirming finding of inequitable conduct after trial); *Baxter Int'l, Inc. v. McGaw, Inc.*, 149 F.3d 1321, 1327-29 (Fed. Cir. 1998) (affirming finding of inequitable conduct after trial); accord, *Dayco Products*, 329 F.3d at 1364-68 (reversing summary judgment finding inequitable conduct and remanding some issues for trial).   There are genuine issues of fact concerning deceptive intent with respect to failure to disclose duct liner products with mat linings, at the very least.   A trial on the issue of inequitable conduct will be necessary.   Knauf's entire course of conduct is available both to support and to rebut the assertions of inequitable conduct.


V.      *Sealed Documents and Evidence*

Much of the evidence and many of the briefs in this case have been submitted under seal.   In reviewing these materials again, the court has questioned the need for any of those materials filed with the court to be kept under seal. The patent claimed an invention back in the early 1990s.   The commercial and market information on file with the court appears to be too old to qualify for trade secret status at this time.   The parties are hereby ORDERED TO SHOW CAUSE no later than March 1, 2006 why any and all sealed materials filed with the court in this action should not be removed from the seal.   Any such showing should be specific as to particular documents and portions of depositions.

VI.     *The Next Steps*

CertainTeed has a pending motion (Docket No. 152) to reopen discovery and to set a further schedule for bringing this matter to a conclusion on its counterclaim under § 285.  That motion is granted, though the further discovery should await the court's action on the *in camera* submissions by Knauf ordered by this decision.  The court will hold a scheduling conference on **Friday, April 14, 2006, at 11:00 a.m.** in Room 330, Birch Bayh U.S. Courthouse, Indianapolis, Indiana, to address those matters.

So ordered.

Date: February 2, 2006

DAVID F. HAMILTON, JUDGE
United States District Court
Southern District of Indiana

-30-

Copies to:

Kandi Kilkelly Hidde
BINGHAM MCHALE
khidde@binghammchale.com

Paul B. Hunt
BARNES & THORNBURG LLP
dmilgate@btlaw.com

Deborah Pollack-Milgate
BARNES & THORNBURG LLP
dmilgate@btlaw.com

Edward M. Reisner
COHEN PONTANI LIEBERMAN & PAVANE
ereisner@cplplaw.com

David O. Tittle
BINGHAM MCHALE
dtittle@binghammchale.com